IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DONALD L. COGAR,

        Plaintiff,

    v.                                       Civil Action No. 3:04-cv-112

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.     Background

      Plaintiff, Donald L. Cogar, (Claimant), filed his Complaint on November 24, 2004,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse

decision by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed

his Answer on July 28, 2005.[2]  Claimant filed his Motion for Summary Judgment on October

27, 2006.[3]  Commissioner filed his Motion for Summary Judgment on November 27, 2006.[4]

B.     The Pleadings

          1.     Claimant's Motion for Summary Judgment.

          2.     Commissioner's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 20.

[4] Docket No. 21.

C.        Recommendation

I recommend that:

1.        Claimant's Motion for Summary Judgment be GRANTED and the case

REMANDED to the Commissioner because the ALJ's hypothetical question to the Vocational

Expert did not incorporate all of Claimant's limitations.

2.        Commissioner's Motion for Summary Judgment be DENIED for the same

reasons set forth above.

## II.  Facts

A.        Procedural History

Claimant filed an application for Disability Insurance Benefits and Supplemental

Security Income on November 19, 1998, alleging disability since August 15, 1995.  The claim

was denied initially and on reconsideration.  Claimant requested a hearing before an ALJ and

received a hearing on June 15, 2000.  The ALJ issued a decision unfavorable to Claimant on

November 17, 2000.  Claimant requested review by the Appeals Council, which remanded the

case to the ALJ.  A second hearing was held on December 11, 2003.  Another decision denying

benefits was issued on January 2, 2004.  Claimant again sought review from the Appeals

Council, but it denied his request.  Claimant brought this action, which proceeded as set forth

above.

B.        Personal History

Claimant was 33 years old on the date of the December 11, 2003 hearing before the ALJ.

Claimant has a high school education. Claimant has prior relevant work experience as a laborer.

C.        Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: August 15, 1995 – December 31, 1998.[5]

**Michael Angotti, M.D., 9/29/89, Tr. 135**
Principal diagnosis: meningitis after craniotomy, streptococcal agalactiae, fractured left clavicle

**Michael Angotti, M.D., 9/12/89, Tr. 138**
Impression: probable meningitis

**James V. Gainer, M.D., 9/13/89, Tr. 140**
Impression: basilar fracture with CSF otorrhea, intracranial air secondary to air leak through paranasal sinus, meningitis secondary to the CSF otorrhea

**Doyle R. Sickles, M.D., 9/20/89, Tr. 141**
Impression: healing clavicle fracture, left

**James V. Gainer, M.D., (Unknown date), Tr. 143**
Provisional diagnosis: meningitis

**Michael Angotti, M.D., 9/29/89, Tr. 145**
Admitting diagnosis: meningitis

**(Unknown provider), 8/2/90, Tr. 147**
Assessment: fractures

**Wan Shin, M.D., 8/3/90, Tr. 149**
Impression: multiple trauma with cerebral concussion

**Jahan M. Joubin, M.D., 8/2/90, Tr. 151**
Pre-operative diagnosis: grade 2 open left femur fracture

Post-operative diagnosis: same

**Jahan Joubin, M.D., 8/6/90, Tr. 152**

---

[5] Claimant was only insured for benefits through December 31, 1998.  (Tr. 23).  Some of the evidence in the record comes from before and after the relevant time period.  Evidence obtained prior to the alleged onset date may be relevant to the instant claim.  See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).  Evidence from after the relevant time period should also be considered as long as it relates to the relevant time period.  Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

Pre-operative diagnosis: grade 2 open left femur fracture

Post-operative diagnosis: grade 2 open left femur fracture

**P. Pascasio, M.D., 8/23/97, Tr. 170**
Final diagnosis: acute gastritis with bleeding

**P. Pascasio, M.D., 8/18/97, Tr. 172**
Diagnosis: possible peptic ulcer disease

**K. Hoover, M.D., 10/29/97, Tr. 189**
Diagnosis: gastritis, bronchitis

**V. Villarreal, M.D., 5/14/98, Tr. 191**
Provisional diagnosis: abdominal pain, nausea and vomitting

Final diagnosis: epigastric abdominal pain, nausea and vomitting, possible peptic ulcer disease

**V. Villarreal, M.D., 5/18/98, Tr. 193**
Diagnosis: peptic ulcer disease, appears improved

**Ertan Esmer, M.D., 10/5/98, Tr. 208**
The patient has dehydration and (illegible).

**P. Pascasio, M.D., 7/7/98, Tr. 213**
Diagnosis: dehydration, abdominal pain

**P. Pascasio, M.D., 7/7/98, Tr. 224**
Impression: tiny renal calculi

**P. Pascasio, M.D., 7/9/98, Tr. 226**
Principal and secondary diagnosis: abdominal pain, leukocytosis, dehydration

**Snead, M.D., 4/9/91, Tr. 227**
Impression: post-operative changes from internal fixation of femur fracture. There has been progression of healing since 2/8/91.

**(Physician unknown), 2/8/91, Tr. 228**
Impression: healing fracture, distal femur

**(Physician unknown), 12/18/90, Tr. 229**
Impression: healing fracture of the left femur with internal fixation

**(Physician unknown), (Date unknown), Tr. 230**

Impression: increase in healing reaction since the last study

**(Physician unknown), (Date unknown), Tr. 231**
Impression: healing fracture of the shaft of the femur with internal fixation

**(Physician unknown), (Date unknown), Tr. 232**
Impression: healing fracture of the right mid clavicle

**Lance D. Dubberke, M.D., 10/6/98, Tr. 234**
Impression: evidence of prior frontal trauma, no acute intracranial process seen

**Arturo Sabio, M.D., 2/28/99, Tr. 237**
Impressions: peptic ulcer disease, chronic back strain, chronic left hip dislocation, degenerative arthritis of the left hip, status post open reduction and internal fixation of the left thigh, seizure disorder, post traumatic

**Eli Rubenstein, M.D., 2/16/99, Tr. 244**
Impression: well healed fracture of the middle third of the shaft of the femur intermedullary rod

**Residual Physical Functional Capacity Assessment, 3/10/99, Tr. 245**
Exertional limitations
        Occasionally lift and/or carry 50 pounds
        Frequently lift and/or carry 25 pounds
        Stand and/or walk for a total of about 6 hours in an 8 hour work day
        Push and/or pull: unlimited

Postural limitations
        Climbing ramps/stairs, balancing, stooping, crouching, crawling: frequently
        Climbing ladders, ropes, scaffolds, kneeling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
        Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: unlimited
        Extreme cold: avoid concentrated exposure
        Hazards: avoid even moderate exposure

**Residual Functional Capacity Assessment, 7/12/99, Tr. 253**
Which, if any of the following levels of work activity would Mr. Cogar be capable of performing in an 8 hour day, based upon his physical impairments alone: sedentary

Would Mr. Cogar be able to sustain any of the following in view of his physical impairments?
     Prolonged sitting: 10 hours at one time, 480 minutes in an 8 hour day
     Prolonged walking: 20 minutes at one time, 60 minutes in an 8 hour day
     Prolonged standing: 60 minutes at one time, 120 minutes in an 8 hour day

Would Mr. Cogar be restricted from any of the following due to his physical impairments alone? If yes, please indicate in each instance the degree of restriction, if any:
     Climbing, balancing, stooping, kneeling, crouching, crawling, stretching, reaching, squatting, bending: never

Would there be restrictions from any of the following?
     Machinery, jarring or vibrations, excessive humidity, cold weather temperatures, fumes, dust, noise, environmental hazards: no restriction

Would it be advisable for Mr. Cogar to lie down or have frequent rest periods during the day: yes

Would Mr. Cogar be expected to experience chronic pain on the basis of his impairments found by you?  If so, please note the degree of chronic pain to be expected: chronic severe

Would he be expected to experience intermittent pain that would be considered severe?  Yes.

In your opinion, does Mr. Cogar have any degree of "functional overlay," i.e., does he have a mental impairment that in combination with his other impairments results in a greater degree of disability than either the physical or mental impairment alone would indicat?  No.

**P. Pascasio, M.D., 8/10/99, Tr. 260**
Diagnosis: intractable vomiting

**P. Pascasion, M.D., 8/11/99, Tr. 274**
Principal and secondary diagnosis: intractable vomiting

**(Physician unknown), 9/16/99, Tr. 276**
Assessment: chronic left leg and hip

**(Physician unknown), (Date unknown), Tr. 276**
Assessment: left hip pain

**(Physician unknown), 9/8/99, Tr. 277**
Assessment: post traumatic pain of the left leg

**P. Pascasio, M.D., 7/7/98, Tr. 278**
Diagnosis: abdominal pain, nephrolithiasis

**P. Pascasio, M.D., 8/99/99, Tr. 278**

Diagnosis: intractable vomiting, upper respiratory infection

**(Physician unknown), 9/30/99, Tr. 331**
Assessment: chronic left leg pain

**(Physician unknown), 9/28/99, Tr. 331**
Assessment: low back and left hip pain

**(Physician unknown), 11/18/99, Tr. 331**
Assessment: low back pain and left hip pain

**Morgan Morgan, M.A., 12/15/99, Tr. 332**
WAIS III
      Verbal IQ: 78
      Performance IQ: 77
      Full scale IQ: 76

The WAIS III test is considered valid.

WRAT III
      Reading: 88 (grade score: 7)
      Spelling: 76 (grade score: 5)
      Arithmetic: 81 (grade score: 6)

The WRAT III appears to be valid.

Diagnostic impressions:
Axis I: anxiety disorder, NOS, alcohol dependency, with physiological dependency, sustained full remission
Axis II: borderline intellectual functioning
Axis III: reported stomach ulcers, incorrectly set bone in his leg, history of seizures

Prognosis: poor

**Medical Assessment of Ability to Do Work-Related Activities (Mental), 12/19/99, Tr. 338**
Marking occupational adjustments
      Follow work rules, relate to co-workers: good
      Interact with supervisors, function independently: fair
      Deal with the public, use judgment, deal with work stresses, maintain
attention/concentration: poor

Marking performance adjustments
      Understand, remember and carry out simple job instructions: fair
      Understand, remember and carry out complex job instructions, understand, remember and

carry out detailed, but not complex job instructions: poor

Marking personal-social adjustments
       Maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations: fair
       Demonstrates reliability: poor

## Residual Physical Functional Capacity Assessment, 1/3/00, Tr. 341

Exertional limitations
       Occasionally lift and/or carry 50 pounds
       Frequently lift and/or carry 25 pounds
       Stand and/or walk about 6 hours in an 8 hour work day
       Sit for a total of about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
       Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards: unlimited
       Extreme cold: avoid concentrated exposure

## Psychiatric Review Technique, 1/3/00, Tr. 349

The patient has psychological or behavioral abnormalities associated with a dysfunction of the brain . . . as evidenced by: BIF; (illegible)

The patient has anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: anxiety D/O

Functional limitation and degree of limitation
       Restriction of activities of daily living, difficulties in maintaining social functioning: slight
       Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner: often
       Episodes of deterioration or decompensation in work or work like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms: once or twice

## Mental Residual Functional Capacity Assessment, 1/3/00, Tr. 358

Understanding and memory
       The ability to remember locations and work like procedures, the ability to understand and

remember very short and simple instructions: not significantly limited

> The ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence

> The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work related decisions: not significantly limited

> The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

> The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without being distracted by them: no evidence of limitation

Social interaction

> The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited

> The ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with co workers or peers without distracting them or exhibiting behavioral extremes: no evidence of limitation

Adaptation

> The ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions: not significantly limited

> The ability to travel in unfamiliar places or use public transportation, the ability to set realistic goals or make plans independently of others: no evidence of limitation

**P. Pascasio, M.D., 12/19/99, Tr. 369**
Impression: there is calcification in the right pelvis, likely representing a phlebolith. This was present and is unchanged from 8-99.

**(Physician unknown), (Date unknown), Tr. 385**
Impression: abdominal pain, exact (illegible) uncertain, probable GE

**A. Sabbagh, M.D., 12/23/99, Tr. 386**
Diagnosis: acute gastritis, abdominal pain, hypokalemia

**A. Sabbagh, M.D., 1/11/01, Tr. 400**
Principal and secondary diagnosis: abdominal pain

**M. Ferrebee, (Date unknown), Tr. 405**
Impression: abdominal pain

**A. Sabbagh, M.D., 12/26/99, Tr. 406**
Diagnosis: acute gastroenteritis, abdominal pain

**A. Sabbagh, M.D., 12/2/6/99, Tr. 418**
Impression: there is poor coating of the stomach due to retained secretions which raises the possibility of gastritis. There is considerable pylorus spasm with subsequent suboptimal visualization of the duodenal bulb and proximal c-loop. Although no ulcer was found, there may have been one that was missed.

**A. Sabbagh, M.D., 12/26/99, Tr. 419**
Assessment: abdominal pain

**(Physician unknown), (Date unknown), Tr. 437**
Diagnosis: abdominal pain, (illegible)

**Mark Meany, M.D., 8/2/90, Tr. 455**
Impression: multiple trauma with probable fracture of the left femur

**D. Misailidis, M.D., 8/2/90, Tr. 456**
Impression of chest: displaced fractures of the left second and third ribs. The superior mediastinum is normal in size. There are increased lung makings noted bilaterally. Apices are not included in the study.

Impression of left shoulder: there is a fracture involving the left second and third ribs. The apices are not seen.

Impression of right shoulder: there is a fracture involving the right clavicle.

**L. Andrew Stewart, Ph.D. and James Battisti, M.Ed., M.A., 4/13-14/00, Tr. 459**
WAIS III
      Verbal IQ score: 83
      Performance IQ score: 73
      Full scale IQ: 76

WRAT III
      Reading: 86 (standard score), 18 (percentile), high school level
      Spelling: 72 (standard score), 3 (percentile), 4th grade level
      Arithmetic: 85 (standard score), 16 (percentile), 7th grade level

Diagnostic impressions:
Axis I: undifferentiated somatoform disorder, major depressive disorder, recurrent, severe without psychotic features, generalized anxiety disorder, alcohol dependence, sustained full remission
Axis II: borderline intellectual functioning, personality disorder NOS

Axis III: history of meningitis, head injury, injuries from motor vehicle accidence, abdominal problems, PUD, hyperness, gastritis, hypokalemia, back problems, seizures, arthritis
Axis IV: medical problems, unemployed, low income, past legal issues
Axis V: current GAF 55

**Mental Residual Functional Capacity Assessment, 4/20/00, Tr. 465**
Understanding and memory
 The ability to remember locations and work like procedures, the ability to remember very short and simple instructions: not significantly limited
 The ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence
 The ability to carry out very short and simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work related decisions: not significantly limited
 The ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to work in coordination with or proximity to others without being distracted by them: moderately limited
 The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: markedly limited

Social interaction
 The ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
 The ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
 The ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes: markedly limited

Adaptation
 The ability to respond appropriately to changes in the work setting, the ability to be aware of normal hazards and take appropriate precautions, the ability to travel in unfamiliar places: not significantly limited
 The ability to set realistic goals or make plans independently of others: moderately limited

**Medical Assessment of Ability to Do Work Related Activities (Mental), 4/20/00, Tr. 470**
Making occupational adjustments
 Deal with the public: good
 Follow work rules, relate to co-workers, use judgment, interact with supervisors, function independently, maintain attention/concentration: fair

Deal with work stresses: poor

Making performance adjustments
    Understand, remember and carry out simple job instructions: good
    Understand, remember and carry out detailed, but not complex job instructions: fair
    Understand, remember and carry out complex job instructions: poor

Making personal social adjustments
    Maintain personal appearance: good
    Relate predictably in social situations: fair
    Behave in an emotionally stable manner, demonstrates reliability: poor

**Psychiatric Review Technique, 4/20/00, Tr. 473**
The patient has psychological or behavioral abnormalities associated with a dysfunction of the brain . . . as evidenced by at least one of the following:
    Memory impairment, change in personality, disturbance in mood, emotional lability and impairment in impulse control: present
    Disorientation to time and place, other: absent
    Perceptual or thinking disturbances: insufficient evidence

The patient has psychotic features and deterioration that are persistent, as evidenced by at least one of the following:
    Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following (inappropriate affect noted present), emotional withdrawal and/or isolation: present
    Delusions or hallucinations, catatonic or other grossly disorganized behavior, other: absent

The patient has disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following:
    There is depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty concentrating or thinking
    There is insufficient evidence regarding manic syndrome and bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.

The patient has anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following:
    Generalized persistent anxiety accompanied by motor tension, apprehensive expectation, and vigilance and scanning
    Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week, recurrent obsessions or compulsions which are a source of marked distress, other:

absent

A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation, recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress: insufficient evidence

It is unclear whether the patient has somatoform disorders from the boxes checked. However, the following is noted:

A history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly, unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury, (illegible) somatoform D/O: present

Persistent non-organic disturbance: absent

The patient has inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress, as evidenced by at least one of the following:

Seclusiveness or autistic thinking, persistent disturbances of mood or affect: present

Pathologically inappropriate suspiciousness or hostility, other: absent

Oddities of thought, perception, speech and behavior, pathological dependence, passivity, or aggressivity, intense and unstable interpersonal relationships and impulsive and damaging behavior: insufficient evidence

The patient has behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system, although the problem is in full remission.

Functional limitation and degree of limitation

Restriction of activities of daily living, difficulties in maintaining social functioning: marked

Deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner: often

Episodes of deterioration or decompensation in work or work like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms: once or twice

**P. Pascasio, M.D., 4/17/00, Tr. 482**
Diagnosis: acute gastritis, hypokalemia

**P. Pascasio, M.D., 4/19/00, Tr. 492**
Impression: CM polyp in mid esophaguys, mild gastroesophageal reflux, considerable edema in the duodenal bulb with active ulcer crater

**(Physician unknown), (Date unknown), Tr. 501**

Impression: GE, hypokalemia

**(Physician unknown), 6/30/8(cut-off), Tr. 504**
Assessment: seizure disorder probably idiopathic type, abdominal pain, possible (illegible)

**P. Pascasio, M.D., 4/19/00, Tr. 507**
Principal and secondary diagnosis: gastroitis, (illegible) duodenal ulcer, hypokalemia, dehydration

**David Hamlar, M.D., 8/29/89, Tr. 511**
Primary diagnosis: comminuted sifrontal depressed cranial fracture with laceration of the dura and numerous facial lacerations

Admission impression: the patient is status post motor vehicle accident with depressed fracture of the right superior orbital rim, and possible laceration of the dura.

**Warren Leimbach, II, M.D., 8/21/89, Tr. 517**
Pre-operative diagnosis: frontal, bifrontal compound depressed skull fracture

Post-operative diagnosis: same

**James W. Ferraro, M.D., 8/21/89, Tr. 519**
Pre-operative diagnosis: comminuted frontal fracture with a laceration of the dura

Post-operative diagnosis: comminuted cranial fracture as well as impairments in pre-operative diagnosis

**James W. Ferraro, M.D., 8/21/89, Tr. 521**
Pre-operative diagnosis: comminuted frontal fracture with a laceration of the dura

Post-operative diagnosis: comminuted cranial fracture as well as impairments in pre-operative diagnosis

**Warren Leimbach, II, M.D., 8/21/89, Tr. 523**
Pre-operative diagnosis: compound frontal depression skull fracture

Post-operative diagnosis: same

Gross diagnosis: osseous tissue

**David Hamlar, D.D.S., M.D., 8/21/89, Tr. 524**
Impression: the patient is status post motor vehicle accident with depressed fracture of the right superior orbital rim with possible laceration of the dura. This comminuted fracture of this same area involves the frontal, sphenoid, and ethmoid sinuses. There are air fluid levels in the

maxillary sinuses bilaterally.  There is a possible contusion of the brain without hemorrhage.  The only other defect is laceration to the right index finger.

**Warren Leimbach, II, M.D., 8/26/89, Tr. 566**
The patient has sustained severe frontal lobe and mid facial trauma with severe comminution of the ethmoid air cells and frontal bones.  The multiple small areas of hemorrhage within the frontal lobes, seen on the last study, have resolved.  There is diminished attenuation in the frontal lobes, right greater than left.  This may represent areas of edema and/or infarction.  There is no evidence of subdural hematoma, nor subarachnoid hemorrhage.

**Alan Weisenberg, M.D., 8/21/89, Tr. 583**
Impression: multiple trauma

**Alan Weisenberg, M.D., 8/21/89, Tr. 584**
Impression: multiple trauma

**S. Craft, M.D., 10/27/97, Tr. 594**
Diagnosis: (illegible), acute gastritis, PUD

**Lois Holloway, M.S., 9/17/03, Tr. 607**
Prognosis: fair

Diagnosis:
Axis I: undifferentiated somatoform disorder, generalized anxiety disorder, major depressive disorder, recurrent, mild, alcohol disorder, sustained full remission
Axis II: borderline intellectual functioning, by history, personality disorder NOS with dependent traits
Axis III: reported history of head injury, history of fractured left femur, reported gastritis, reported history of seizure disorder

**Medical Source Statement of Ability to Do Work-Related Activities (Mental), 9/20/03, Tr. 612**
Is ability to understand, remember, and carry out instructions affected by the impairment?  A box is not checked, however since boxes below are checked that only result from a yes answer, the answer must be yes.
Understand and remember short, simple instructions, carry out short, simple instructions: no restriction
The ability to make judgments on simple work related decisions: slight restriction
Understand and remember detailed instructions, carry out detailed instructions: moderate restriction

Is the ability to respond appropriately to supervision, co-workers, and work pressures in a work setting affected by the impairment?  Yes.
Interact appropriately with the public: slight restriction

Interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to changes in a routine work setting: moderate restriction

Respond appropriately to work pressures in a usual work setting: marked restriction

Are other capabilities affected by the impairment?  Yes.

Reliability: the person tends to develop somatic symptoms when under stress.

**Rodolfo Gobunsuy, M.D., 9/19/03, Tr. 614**

Impression: the patient has a significant head injury and there is a scar from craniotomy.  He has a headache every day and it does not matter what time of the day it is.  The headache remains the same in consistency and intensity.  This could be chronic sinusitis, but could also be a post-concussion headache.  The neurological examination is normal.  There has been injury to the olfactory nerve, which made him lose his sense of smell.  The patient also has a history of a left femoral fracture.  There is pain in the low back due to strain.  He has pain in the left hip that could be due to instability or strain as well.  The range of motion of the left hip is more than normal.  He can actually internally rotate the hip to more than 100 degrees.  There is no atrophy of the left thigh muscle, left gluteus muscle nor his left leg.  Although there is mild antalagia, he walks steadily.  The patient stated he cannot squat because of his pain.  There is obvious muscular ligamentous injury or weakness around the left hip joint, but there is no atrophy.

**Medical Source Statement of Ability to Do Work-Related Activities (Physical), 9/18/03, Tr. 620**

Exertional limitations

Occasionally lift and/or carry 20 pounds

Frequently lift and/or carry 10 pounds

Stand and/or walk at least 2 hours in an 8 hour work day

Sitting is not affected by the impairment

Push and/or pull: limited in the lower extremities

Postural limitations

Balancing, kneeling, crouching, crawling, stooping: occasionally

Climbing ramps/stairs/ladders/rops/scaffolds: never

Manipulative limitations

Reaching in all directions, handling, fingering, feeling: unlimited

Visual/Communicative limitations

Seeing, hearing, speaking: unlimited

Environmental limitations

Hazards: limited

Temperature extremes, noise, dust, vibration, humidity/wetness, fumes, odors, chemicals, gases: unlimited

**Rodolfo Gobunsuy, M.D., 9/19/03, Tr. 624**
Impression: the patient has a significant head injury and there is a scar from craniotomy. He has a headache every day and it does not matter what time of the day it is. The headache remains the same in consistency and intensity. This could be chronic sinusitis, but could also be a post-concussion headache. The neurological examination is normal. There has been injury to the olfactory nerve, which made him lose his sense of smell. The patient also has a history of a left femoral fracture. There is pain in the low back due to strain. He has pain in the left hip that could be due to instability or strain as well. The range of motion of the left hip is more than normal. He can actually internally rotate the hip to more than 100 degrees. There is no atrophy of the left thigh muscle, left gluteus muscle nor his left leg. Although there is mild antalagia, he walks steadily. The patient stated he cannot squat because of his pain. There is obvious muscular ligamentous injury or weakness around the left hip joint, but there is no atrophy.

**P. Pascasio, M.D., 8/23/97, Tr. 628**
Final diagnosis: acute gastritis with bleeding

**(Physican unknown), (Date unknown), Tr. 647**
Assessment: chronic light leg and lumbar pain, GERD

**(Physican unknown), (Date unknown), Tr. 648**
Assessment: chronic light leg and lumbar pain

**David Hubbard, M.D., 11/1/00, Tr. 651**
Findings and impression: there is evidence of an IM nail fixation of a prior left femoral shaft fracture. There is fairly significant asymmetric internal rotation of the left femur as compared to the right. Associated medical titl/rotation of the knee joint is noted on the left.

**(Physican unknown), 9/3/01, Tr. 652**
Primary diagnosis: broken left bicuspid

**(Physican unknown), 3/29/02, Tr. 654**
Primary diagnosis: chronic left leg pain
Secondary diagnosis: gastritis

**(Physican unknown), 8/4/03, Tr. 656**
Primary diagnosis: laceration of the left index finger

**P. Pascasio, M.D., 11/15/00, Tr. 663**
Admitting diagnosis: nausea/vomiting

Principal and secondary diagnosis: (illegible), dehydration, hypokalemia

**P. Pascasio, M.D., 11/15/00, Tr. 664**
Final diagnosis: acute gastritis with bleeding, dehydration, hypokalemia

**P. Pascasio, M.D., 11/11/00, Tr. 666**
Diagnosis: acute gastritis with bleeding

**P. Pascasio, M.D., 4/13/00, Tr. 669**
Principal and secondary diagnosis: (illegible) ulcer, hypokalemia, dehydration

**P. Pascasio, M.D., 4/17/00, Tr. 670**
Diagnosis: acute gastritis, hypokalemia

**P. Pascasio, M.D., 5/1/02, Tr. 684**
Principal and secondary diagnosis: erosive duodenitis, anemia secondary to blood loss

**P. Pascasio, M.D., 5/1/02, Tr. 685**
Final diagnosis: erosive duodenitis, anemia secondary to blood loss

**P. Pascasio, M.D., 4/27/02, Tr. 687**
Diagnosis: bleeding peptic ulcer

**Khan/Mahmoud, 11/15/02, Tr. 692**
Impression: hyperinflated lungs, no acute consolidation

**P. Pascasio, M.D., 4/17/00, Tr. 695**
Diagnosis: duodenal ulcer, polyp of esophagus, dehydration

**P. Pascasio, M.D., 11/11/00, Tr. 695**
Diagnosis: dehydration, hypokalemia, acute gastritis with bleeding

**P. Pascasio, M.D., 4/27/02, Tr. 695**
Diagnosis: erosive duodenitis, anemia secondary to bleeding, dehydration

**(Physician unknown), 11/11/03, Tr. 696**
Diagnosis: dehydration, PUD, fracture left femur, non union, old

**P. Pascasio, M.D., 11/9/03, Tr. 697**
Diagnosis: dehydration, peptic ulcer disease, fracture left femur with non-union

D.    Testimonial Evidence

Testimony was taken at the December 11, 2003 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q     Okay.  And back - - how about the driver's license?  You have a driver's license?

A     No.

Q     You ever have one?

A     I used to.

Q     What happened?

A     Unpaid tickets.

Q     You lost it?

A     Yes.  If I can pay my fines up, they'll give it back to me.

                    *              *              *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q     When you returned to work, did you have any symptoms relating to those accidents?

A     Yeah.  I couldn't be on my - - standing a long time.  I took and tried lifting stuff, but -

Q     Okay, so you felt that your lifting and your standing were affected.  Now how regular was the work you did after you got out of the hospital with those two accidents there?

A     For awhile it was every day until I just started missing work because of it, and - -

                    *              *              *

Q     Do you think you missed any work in '94?

A     Yeah.

Q     Could you tell me a little bit about that?

A     I got to where I was missing one to two days a week, and - -

Q     Okay, and the reason you were missing - - we're talking about '94.  Now the

reason you were missing one or two days a week back then was what?

A        Pain and hurting.

Q        Okay.  Where was your pain and your hurting?

A        My left leg and my hip and lower back.

Q        Okay.  Did you have any difficulty as far as the plates in your head or the plates in your face, or anything like that?

A        Thinking and stuff, but - -

Q        I beg your pardon?

A        My thinking was slowed down a little bit.

                    *               *               *

Q        All right, well, before I go any further with '94, let me ask you a question.  What was going on with any kind of alcohol or drug use back during this period?  Now we're looking at the time period, say, '92 and '94.

A        I used to drink a lot.

Q        Okay.  Now by saying you used to drink a lot, how much do you drink now?

A        Not near as much as what I used to.

Q        Okay.  What - - how much do you drink, and tell me a little bit about what your patterns are.  Did you ever quit entirely?

A        Yeah.

Q        For how long?

A        Two or three months.

Q        Okay.  And then what?

A       Have a drink or something, fall off the wagon.

Q       Okay.  And then what would happen?

A       I'd just go back to drinking and stuff, and then I'd go back out and try to get another job working.

Q       Okay, now let me ask you this.  During this period between '92 and '94, were some of your absences the result of your drinking?

A       No.  No, it wasn't.

Q       Why not?  Well, in other words, you said you - -

A       I didn't let my drinking interfere with my work.

Q       Okay.

A       I didn't do - - I didn't drink while I was at work or anything.

Q       Okay, so you didn't drink on the job.

A       No.

Q       When did you do your drinking?

A       In the evenings.

                    *                    *                    *

Q       Okay, what were you doing for Dennison Manufacturing?

A       They made hinges for Rable's Trucking [phonetic].  I cut metal and stuff.

Q       Okay.  And were you working at that job fairly regularly?

A       Yes.

Q       Why did that job end?

A       Just - - I couldn't take the lifting.

Q      Well, did this happen all at once, that all of a sudden you couldn't take  the lifting, or were you having some difficulty along the way?

A      Yes, I was having difficulty along the way.  I had to have help picking stuff up.

Q      And was this like a small shop?

A      Yeah.

Q      How many people working in it?

A      Four or five.

Q      And so what kind of help did you need?

A      Just to put stuff up on tables and take - -

Q      And what actually were you doing?

A      Cutting pieces of aluminum.

Q      Cutting pieces of what?

A      Aluminum.

Q      Aluminum?

A      Yeah.

Q      Okay.

A      Heavy chunks of aluminum.

Q      Okay, now when that work ended, had you missed any work along the way?

A      Yes.

Q      Okay, was that off and on or just towards the end?

A      It was off and on.

Q      All right.  What was going on with alcohol during this period?

A      I didn't - - well, I didn't let the alcohol interfere with my work.

Q      Okay.  So if I understand you, you were still drinking some then?

A      Yes.

Q      Do you remember what your patterns were then, like how much you were drinking and when?  Now let me just make something clear.  If you remember I want you to tell me; if you don't remember I want you to tell me.  Okay, because - -

A      I don't really remember - -

Q      Well, let's - -

A      - - I drank.

Q      You know you were drinking some during the year - -

A      Yeah.

Q      - - 1995?

A      Yeah.

Q      Okay.  Did your boss know what you drank?

A      Yes.

Q      Did you ever get into any difficulty with your boss because of drinking on that job?

A      No.

Q      Okay, now I didn't ask you the question about any other substances.  During this period of time were you using marijuana?

A      No.

Q      Not at all?

A    No.

Q    Not ever?  Okay.  Now 1995 when you stopped work, tell me what was going on with you as far as your physical health during the years '95 up until 1998.

A    I would take and go try to work, and I just - - if I worked today, tomorrow I couldn't hardly get up out of bed and walk around and stuff.

Q    Okay, so if I understand what you're saying, you made several attempts to work during that period.  Okay, do you remember any particular attempts that you made?  Did I understand - - excuse me, I didn't mean to interrupt.  You looked like you weren't going to be able to answer that question.  Did I?  Okay.  Well, did I hear you say earlier that when you made an attempt to work that you would end up in the hospital?

A    Yes.

Q    Well, maybe if that - - if you can think of the times that you were in the hospital during that period, that might help you remember what you were doing at the time.

A    I tried to help pour some concrete, and that put me in the hospital in Kentucky.

Q    Okay.  How long were you working on the concrete job before you ended up in the hospital, approximately, if you remember?

A    The second day.

Q    And when you ended up in the hospital, what as the problem?

A    My stomach ulcers.  Dehydrated.

Q    Okay, now - - -

A    Can't hardly work in the sun.

Q    Okay.  In between times when you weren't trying to work, were you having any

problems with your stomach?

A    Yes.

Q    Were you limited in what you could do?

A    Yeah.

Q    Tell me about that.  Now just on your stomach, what sorts of things did that keep you from doing?

A    If I - -

Q    Well, like what couldn't you do because of your stomach?

A    I couldn't go out and work in the sun or - -

Q    Okay.

A    It dehydrated me.

Q    Okay.  How much exertion in the sun would it take to get you so dehydrated?

A    If it was hot out and everything, one day.  And the second day I - -

Q    All right.  How hot would it have to be?

A    80's.

Q    Now when you say dehydrated, is that from perspiring, or were you sick at your stomach and throwing up, or what?

A    Yes, I was sick in my stomach, throwing up, and could not keep nothing down. Water or - -

Q    Okay.  Now in between the time that you were trying to work on these jobs, were you able like to get out in the yard and do some things around your mom and dad's house, or something like that?

A       Just little things.  Not much.

Q       How long - - well, tell me what little things you were doing around your house.

A       I was taking - - help out do little things.

Q       Well, like what?

A       Dishes or just - -

Q       Okay, dishes inside of the house.  What about outside of the house?  Were you able to help with the lawn mowing or - -

A       No, I didn't do that.

Q       Not ever?  Or you - -

A       My dad, he took care of all that.

Q       Okay.  Had you tried to do it and been unsuccessful at it?

A       Yeah.  He didn't like me going out working in the sun because ended up [INAUDIBLE].

Q       So he knew what would happen?

A       Yes.

Q       So he just didn't want you to do it, didn't ask you to do it?

A       Yeah, he didn't ask because - -

Q       All right, well, let me - -

A       - - I ended up in the hospital and stuff.

Q       All right, well, you told me about that time pouring concrete in Kentucky.  Can you think of any other jobs that you tried that you ended up in the hospital?

A       Just about all the jobs.

Q       Well, how many times do you think you've ended up in the hospital after trying to do some kind of work after '95?  If you can take a guess at it.  Now if you don't remember exactly, you say so.

A       I usually went to the hospital maybe four times a year, four to five times.

Q       Okay.  Would this be like the emergency room?

A       Emergency room, then checked into the hospital.

Q       Overnight?

A       Usually a week.

Q       And do you remember any other particular hospitals you were in?

A       I was in Stonewall Jackson, Weston.

Q       Okay.

A       Clarksburg Memorial.

Q       Do you remember whether you were in Stonewall Jackson more than once after '95?

A       Yes, I was in there several times.

Q       Several times.  Do you remember any of the specific jobs that you were doing that put you in there?

A       No, not right off.  Just whatever - -

Q       Okay, whenever you would attempt a job.  Now are you talking about a little job helping a friend, or are you talking about a regular job that you would go and try to undertake regular employment?

A       I tried.  I mean, I just couldn't handle it.

Q        Couldn't handle it, okay.  So you went to Stonewall a couple of times.  And you said - - did you say United Hospital - -

A        Clarksburg.

Q        - - in Clarksburg?

A        Yes.

Q        Do you remember if you were there more than once after '95?

A        Yes.  I was there several times too.

Q        Okay.

A        They transported me.

Q        Transported you from another hospital?

A        From Stonewall.

Q        Stonewall.  okay, what about Braxton County [phonetic] or any other hospitals that you can recall?

A        I went to Braxton County just a little.  But they wasn't really treating me, I don't think, but - -

Q        Okay, so you were in the emergency room there?

A        Yes.

Q        And it's just that if you had a choice, you didn't go back?

A        Right.

Q        Okay.  Now during this time period, what was going on with your drinking and what was - - was there marijuana involved during this period?

A        No, just drinking.

Q    Just the drinking, okay.  Tell me about the drinking between '95 and '98, if you can recall, approximately.  Judge, I don't think I've asked that time period ever.

BY ADMINISTRATIVE LAW JUDGE:

Q    Well, basically - - okay, yeah, it's relevant.  And if you could tell - - there seems to be periods of, you know, abstinence, and then after while you fall off the wagon.   And that was kind of true throughout the whole period up until just recently?

A    Yes.

Q    Yeah, okay.  You stopped drinking and then maybe - - what?  You felt a little bit under stress - -

A    Yeah.

Q    - - and you'd have five or six beers?  But - - okay, it wasn't - - you know, so it wasn't a dominant thing in your life?

A    No.

Q    No, okay.  So you don't think, say, if you stopped - - if you didn't have any drinking whatsoever, you think you could've worked?

A    No.  The drinking did not - -

Q    Okay.  The drinking was not a material factor - -

A    No.

Q    - - in your not working?

A    No.

Q    Okay.  You were not working because of other - -

A    Right.

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       - - Dr. Viscossia.  Okay, now we haven't asked you about your leg.  Now tell me about your leg.  What's going on there?

A       I can't hardly get up and down steps, or long periods of time walking or sitting.

Q       Okay, now something strange has happened with the way that leg healed.  Is that right?

A       Yeah.  The doctors put it back together with a twist to it.

Q       Okay.  And does your leg turn - -

A       Turns all the way around.

Q       - - all the way so that your foot will point backward?

A       Yes.  I can turn my leg all the way around backwards.

Q       Okay.  And have you seen a doctor up at West Virginia University - -

A       Yeah.

Q       - - about that?

A       Yes.

Q       And was that Dr. Humper [phonetic]?

A       Yes.

Q       Okay, and did he want to do some surgery on it?

A       Yes.

Q       And what happened about that?

A       I was just afraid because that's what messed it up to begin with.  Fearful that he'd

want to take the pin out, and break and reset it.

Q        Okay.  Well, did it ever completely heal, as far as they're telling you?

A        It still gives me problems.

Q        Now in addition - - well, before I ask you about the feeling of it, let me ask you about things like walking.  Does that leg interfere with you if you're just walking along?

A        Yes.

Q        How does it interfere?

A        I've got to stop and rest because it goes to hurting.  And it'll give out on me.

Q        Does that leg - - does that foot stay straight in the proper position when you're walking?

A        It'll turn in to the inside.

Q        Does it ever cause you to fall?

A        Yes.

Q        Does it take kind of some effort to try to hold it straight?

A        Yeah.

Q        Any problems with things like going uphill or going downhill?

A        Yeah.

Q        And you've already told us about the stairs.  What - - but what is it about going up and down steps that seems to be the problem?

A        Just where I pick up my weight every time and set it back down on it.

Q        Are you saying it's hard to lift your leg?

A        Yeah.  Lots of times I'll just have to take one step at a time, and set up with my

right foot and then pull my leg up each time.

Q	Okay.  In other words, you can't go leg over leg at all or just sometimes?

A	Most of the time, no.

Q	Okay, and is it pain or weakness that causes that to happen?

A	Pain and weakness.

Q	All right.  Now what about the distance that you're able to walk?  I'm going to ask you if that's changed since 19, say, '95.  Or has it been different during this time period?  In other words, has your walking gotten any better, gotten any worse, or been about the same?

A	It depends a lot on the weather too.  If the weather goes to changing, it's worse.  And it's not got any better as far as distance or anything go.

Q	All right.  About how far do you feel that you can now and could have back, say, prior to '98 walked at one time on level ground without having to stop and without being in enough discomfort that you would need to stop?

A	I don't know, I never really measured that.

Q	How much walking do you do?

A	I usually get somebody to take me around wherever I need to go.  Maybe about 100  to 200 yards.

Q	Okay, now that's - - 100 is about the length of a football field.

A	Yes.

Q	And 200 of course would be about two times a football field.  How often do you walk  approximately that much, do you think?

A	Not very.

Q      Not very often?  How often approximately?

A      Maybe once a day or something.

Q      Two hundred yards at a shot every day?

A      I just go to the neighbor's house or something.

Q      Oh, okay, so you are doing it every day.  Okay.

A      Well, no, not every day.

Q      Okay.

A      I haven't done it for a while.

Q      When you do that, are you able to do that without stopping?

A      Sometimes.

Q      Okay, all right.  Well, that - -

A      I can sit down after I get dinner.

Q      All right.  What about standing in place?  Now let's say that you're standing in a situation where you can shift your foot.  You know, shift from side to side, and maybe walk one step away.  Think about standing maybe at a counter or maybe in a checkout line in a store, or something like that.  About how long do you think you could have stood at one time back - -

A      I usually didn't stand in line.  Put all my weight on my right side.

Q      Okay.  And approximately - - if you're kind of bearing your weight on your right side, approximately how long can you stand before you get in a difficulty that you need to get off your feet?

A      About an hour.

Q      All right.

A        - - the most.

Q        You say an hour at the most?

A        Yes.

Q        Now let me ask you, in the course of a normal every day, how much standing and walking do you think you do in, say, an eight-hour period?  Say, between 9:00 and 5:00.  How much time are you up on your feet as opposed to being in some other position?

A        Not very much.

Q        Why not?

A        It just hurts.

Q        In the course of a normal day, what are you doing as far as your positions?  Could you tell me a little bit about that?

A        I got to sit down, prop my leg up, or lay down, or - -

Q        And why are you doing that?

A        It just gives me pain.  It feels like somebody's sticking needles in my hip and my knee.

Q        Okay.  Has that been going on - -

A        Yes.

Q        - - back in that time period between '95 and '98?

A        Yes.

Q        When you're standing and walking can you - - is there a time when you first stand up or you first start walking that you don't feel any pain?

A        No.  When I first stand up it - - lot of times I'll have to get my balance and stuff

before I can walk or riding or - -

Q      Well, is - - okay, I understand that, but my question has to do with pain. In other words, does your leg hurt sometimes when you're on it, or does it hurt - -

A      About all the time. It's - -

Q      Can you - -

A      Pain's there all the time.

Q      Can you take a step without pain?

A      No.

Q      So if I understand what you're saying, any time you're up on it, whether you're walking or standing, it hurts.

A      Yeah. It hurts right now while I'm sitting.

*       *       *

BY ATTORNEY:

Q      All right. On a scale from 0 to 10 - - now 0 means no pain at all, okay, and 10 is really bad pain. that's the kind you might have to go to the hospital and get a shot. It's just terrible pain. All right, and 5 is just kind of in the middle. That's pain that's considered kind of moderate pain, but it's not bad - - bad but not terrible, okay? Now between 0 and 10, could you kind of tell me what happens to your pain in the course of a day? Like does it go up and down and change numbers, or stay the same?

A      It usually stays around - - well, it's about 5 all the time, but - -

Q      All right.

A      - - 7 or 8.

Q        Okay, well, let me ask you.  When it's 5, is that when you're on your medicine or off your medicine?

A        It still hurts even when I'm on the medicine.

Q        Okay.  Now when - -

A        If I try to get up and move around, it's - - the pain is still there.  I can take all the medicine.  It's just - - it doesn't - -

Q        It just doesn't take it all away.  Well, now when it goes up into the 7 and the 8 range, what causes it to go up like that?

A        Just moving around, walking.

Q        Being up on it, kind of?

A        Yes.

Q        Okay, what about when you're sitting down?  How do you feel if you're sitting?  Sitting down and not getting up.

A        5 or a 6.

Q        All right.  Now are you - - how long can you sit in a normal position like you're in now with your feet on the floor, and be reasonably comfortable?

A        Five or ten - -

Q        And when that - - after that time period, what is the reason that you're not able to tolerate?

A        It just hurts my hip there.  Here, if I get up it'll give out on me.  Try and get up and walk.

Q        So you're saying if you sit - -

A      Occasionally.

Q      - - long, then you can't get up very well?

A      Yes.

Q      If you sit long - - does it have anything to do with your pain if you sit longer than an hour, an hour and a half?

A      The pain's there all the time.

Q      Okay.  Well, you indicated to us that from time to time you needed to get in some other positions and prop up your leg?

A      Yes.

Q      Tell me a little bit about that.  When and why do you have to do that?

A      When it gets hurting, I have to lay down or something and prop it up and move around, move off - -

Q      All right.  Is there any kind of pattern to that or any particular time that you do that or have done that?

A      I have to do it all day.  Off and on all day.

Q      How long has that been true?   How long have you been having to do that?

A      Quite some time now.

Q      Well, are you talking about back between '95 and '98, or after that time period?  When do you think you - - or how long do you think you needed to do that?

A      I've had to do it ever since broke my leg.

Q      Well, now there was a period back then after you broke your leg when you were working?  Were you - - you weren't doing it on the job, were you?

A       No.  I'd have to stand on one leg.  Put my leg up on something at work there.

Q       Okay, so - -

A       Take all the weight off of it.

Q       All right, I think I understand.  That you were taking what opportunities you could to elevate it?  Okay.  Well, now before I leave your leg, is there anything else about this that you need to tell us?  How about getting down on your knees?  Any problem with that?

A       I can't hardly get back up.

Q       Okay, any other particular motions?  How about movement of the hip?  Is it worse if you move it at the hip, or move it at the knee, or does it matter?

A       It doesn't matter.

Q       Okay, well, let me ask you a little bit about your head and your face and any other problems that you have, say, from your waist up.  Not counting your stomach because you've already told us about that.  Anything else bothering you?  Your head, your shoulders, arms, anything like that?

A       The plates in my head and stuff there.  I - - it's like [INAUDIBLE] I have bad headaches.

Q       Okay.  Do you feel that you notice a difference in yourself after you had that accident?  Do you know - - does your - - had your family said anything to indicate whether they notice anything different about you?

A       Yeah.  I get - - the littlest things just irritate me, bother me bad.

Q       What happens when you get bothered bad?

A       I get mad, lose my temper.   And headaches.

Q        Do the headaches have anything to do with the feeling of getting irritated?

A        Yeah.

Q        You think they do.  Have you ever noticed anything else that is related to the headaches?  Do sometimes they come on for no reason, or can you usually think of something that brought them on?

A        No, sometimes they'll just - - just get a headache for no reason.

Q        All right, well, let's focus on that period, say, between '95 and '98.   Now that's after Dennison Manufacturing, okay?  Back during that time period, were you troubled with headaches back then?

A        Yes.

Q        Has the situation changed, say, between then and now?

A        It's - -

Q        You're shaking your head.

A        Same there.  If I get stressed or something, it's - -

Q        Okay, so it's about the same.  And could you kind of estimate for me approximately how often you have a headache that you consider bad?

A        I have one every couple days or so, bad headache.

Q        Okay.

A        Thinking a lot or stress.

Q        You say if you go to thinking a lot?

A        Yeah, stressful situations or  - -

Q        Okay, is there something - - what kind of thinking cause you to have a headache?

A       Just problems, stuff bothering me, or - -

Q       Oh, you mean like maybe brooding or worrying about things?

A       Yeah.

Q       Something like that?  Okay, what about if you need to do something and you are trying to figure out how to do it?

A       Yeah.

Q       Can you do that without getting a headache?  Is it just - - is it the worrisome things will - -

A       I try and think and do something there or something, put something together or something.  Don't work right - -

Q       You say it doesn't  work  right, and then you shook your head.  And you mean you get frustrated easily over it?

A       Yeah.

Q       Is that the sort of thing that tends to trigger headaches for you?

A       Yeah.

Q       Okay.  Now you said that you consider these bad headaches.   On a scale from - 0 to 10 - - now it's the same kind of question I asked you about your other kind of aches and pains.  So could you use that - - use those numbers, and try to tell me kind of what goes on with your headaches?

A       Sometimes it's worse and sometimes it's - -

Q       Okay, all right.  You're telling me that you had ones that you consider bad.  What number do you consider a bad headache?

A    They're all bad, but - -

Q    Well, do you understand the question?

A    - - 6 or 7.  Yeah.

Q    Go ahead, I'm sorry.  I didn't know - -

A    6 or 7.

Q    Okay, and that's - - you consider that a bad headache?

A    I can't think or - -

Q    I'm sorry?

A    I can't think or anything.

Q    Okay, when you have one of them, you can't think?

A    Yes.

Q    All right.  And you indicated, about every other day you have something like that.
Are there times that you have headaches that are not that bad?

A    Yeah.

Q    How often do you have headaches that are not that bad?

A    About every day.

Q    Well, let me ask you this.   How much of the time do you have some kind of a
headache?

A    About 40 to 50 percent of the time.

Q    Okay.  Is this any particular time of the day that you have the headaches or just - -
do they come and go through the day?

A    Yeah.

Q    Okay.  So you're saying every other day they get bad to the point that you can't think?

A    Yes.

                    *            *            *

Q    What do you do for a headache when you have it like that?

A    Lay down, close my eyes.

Q    Do the headaches ever make you get sick at your stomach?

A    Yeah.  I'll take - - upset my stomach.  I take some of my stomach medicine for it sometimes.

                    *            *            *

Q    Now when you get a bad one like that to the point that you said you can't think, how long do they last before you can kind of - - you said you're lying down.  And how long does it last before you can get up and do whatever it was you were doing before you had your headache?

A    Thirty minutes to an hour or something.

Q    Okay, now is there any particular time of the day that this comes on?

A    No.

Q    Okay, all right.   Now is this different from the times that you told me that you were lying down because of your back and your leg?

A    Yeah.

Q    This is something else, something in addition to that.  I don't think I asked you, that when you lay down - - now did you say lie down and elevate your foot, or did you say

sometime you sat and elevated your foot?

A      Both.

Q      Both.  All right, when you do that - - either lie down or sit down and elevate your foot - - how high do you have to elevate it when you sit down?

A      I'll take and elevate it level with - - try to elevate it level with the chair I'm sitting on.

Q      How long do you have to do that before you get some relief, and you can let your leg down and maybe move around and start doing something else?

A      Well, it just depends.  Sometimes they're 30 to 40 minutes or sometimes longer.

Q      All right.  When you do that, how many times do you think you need to elevate or lie down?  Now I know you - - you know, it's not exact, but just give me your best guess.  At about how often or how many times a day do you need to do that a week or a month, however often you do it?

A      Two, three times a day sometimes.

Q      Okay.  So that's kind of like an average?  All right.  Now tell me about your nerves.   And we talked a little bit about that.  You told us that you got frustrated easily, and you told us you lost your temper easily, and you told us that when you get upset and frustrated, that tended to bring on your headaches.  What about like sleeping at night?  Do you get good sleep during the night?

A      No.  I toss and turn.

Q      Why is that?

A      It's from my leg or - -

Q      Is that because you're restless, or pain, or what is it?

A      I can't lay on my left side that long.

Q      Okay.  And some of these times that you told us that you're lying down because of your headache, or resting your leg or your back, do you do any sleeping during the daytime, or do you just rest?

A      I might have to take a nap or something.

Q      How often do you think you actually do some sleeping in the daytime?

A      Not very - -

Q      Not too often?  Okay.  What about getting out and about in public places?  How often do you go out in some kind of a public place?

A      Not very much.

Q      When you say not very much, give me your guess, your estimate, of how often you go out. Like do you do any shopping?  Do you have to get any food or medicine or something like that?

A      No.  Somebody go get it for - -

Q      Okay, are there some times that you go?

A      Yeah.

Q      All right.  Well, how often do you think you go?  Estimate.

A      Just once or twice a week.

Q      All right.  When you go out, where do you go?

A      I'll go to the store or something.

Q      What kind of store do you go to?

A        Go Mart or

Q        Okay.  Now Go Mart, that's kind of a small place?

A        Yeah.

Q        What about going to a bigger place like Wal-Mart, or Lowe's, or someplace like that?  Any particular problem with going in those stores, or are you able to go in those stores okay?

A        Yeah. [INAUDIBLE].  I don't like putting up with it.

Q        So you don't like going in the stores.   What is it you don't like putting up with?

A        When people - - like they - - something happens and they don't go get it or something, I get aggravated.  My leg'll - -

Q        All right, now I think you've told us that when you get aggravated, sometimes you say things that you maybe shouldn't do.  Has that happened to you in any public places?

A        Yeah.

Q        Could you tell me a little bit about that?  What's happened to you in public places?

A        Embarrassing.

Q        I'm sorry.  I didn't understand.

A        Just get embarrassed and - -

Q        Well - -

A        - - because something happens and I'll get aggravated, and go off.

Q        Go off?  Now when you say go off, what do you mean by go off?

A        I just tell them off or something.

Q        Has that happened to any - - in the Go Mart, or Lowe's, or Wal-Mart, or anyplace like that?

A        Yeah, it's - -

Q        Well, let me ask you this.  Do you avoid going out?

A        Yeah.

Q        So if you avoid it, what sorts of things actually make you want to go out, make you have to go out?

A        If I can't get somebody else to go or something, or just got to go, or - -

Q        Okay.  What kinds of people would go for you?

A        My dad or brother.

Q        Okay, all right.

A        Couple friends.

Q        Okay, now you spoke of friends.  Do you see friends off and on?

A        Yeah.

Q        How often do you see friends?

A        They stop in, visit with me.

Q        Okay.  When you say they, anybody in particular, or - -

A        Just people I - - some people my age or - -

Q        Okay.

A        - - that I went to school with.  Neighbors.

Q        Okay.  So you say they stop in.  Do you ever go to their places?

A        No.

Q      Did I understand you to say you walked to a neighbor's house?

A      Yeah.

Q      Okay.  Who is this neighbor?  Is that somebody - -

A      John Allen [phonetic].

Q      Okay.  Is this one of these people you're talking about?

A      Yeah.

Q      He's about your age?

A      He's older than me.

Q      Okay.  What's his age, about?

A      He's around 40.

Q      Is he employed somewhere?

A      No.  He's disabled too.

Q      Okay.  So you just kind of spend some time with him?

A      Yeah.

*        *        *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q      Okay.  And Mr. Mahler, you have reviewed the file.  Is that right?

A      Yes, Your Honor.

Q      What does it show as far as the Claimant's vocational background?

A      It shows a younger individual with a high school education, and basically general laborer for the time period we discussed.  I think it was from '93 to '95.  And for various - - looks like four different employers.  In general, this would be classified as heavy, low semi-

skilled/unskilled work, Your Honor.

Q       Okay.  Now would there be any transferable skills to either light or sedentary jobs?

A       No, there would not be.

Q       If we have a hypothetical individual who has a similar vocational background as the Claimant in terms of age, education, and prior work.  And this hypothetical individual has the limitations that the Claimant stated here today during the hearing that he had.  Could you tell me - - was there enough information today elicited that you could make an opinion as far as whether such work might be preclusive or - -

A       Yes, Your Honor.  In listening to the testimony, I would say if he had to lie down, sit down for the periods he indicated during the day, every other day or whatever, he could not work on an eight-hour basis in competitive employment, Your Honor.

Q       Now I need you to take a look at Exhibit B-19.  There's - - and okay, the first page has a definition of the terms.  Could you read that first and make sure that you understand what the doctor is saying?

A       Yes.  This is a mental or residual capacity form.

Q       Yeah, yeah.

A       And basically, the examiner indicates that this individual would have marked inability to respond appropriately to work pressures in a usual work setting.  And marked is defined as a serious limitation.  The ability to function is severely limited but not precluded.  Okay, that's the only marked limitation.  There's several moderates.

Q       Yeah.

A      And moderate is described as - - moderate would be an individual would still be able to function satisfactorily with the moderate limitation.

Q      Okay.  So keeping those - - that - - those limitations in mind, say we have a hypothetical individual with a similar vocational background as the Claimant.  And hypothetically, this individual might be able to do light exertion - - work requiring sedentary and light exertion.  He'd have to have a sit-stand option.  He would also be - - have to avoid hazards such as uneven ground, moving machinery, those kind of things.  And additionally, the hypothetical individual would have to avoid work in the sunlight.  And then also, the hypothetical individual would have  the mental limitations in Exhibit B-19.  Could you identify any jobs such a hypothetical individual might be able to do?

A      There would be routine, repetitive jobs, Your Honor, that a person would be able to perform with those limitations indicating in your hypothetical.  Some examples at the light level of exertion would be hand packers.  There are 600 in the local labor market, 200,000 nation.  There are laundry folders, 300 local, 48,000 nation.  There are sorters and graders, 200 local, 49,000 nation.

Q      I'd like to proffer you to Exhibit B-20F, Pages  7, 8, 9, 10,  and could you take a look at those?

A      Yes, Your Honor.

Q      Okay.  Now if I - - if instead of exertional limits that I specified to you before - - the light, the sit-stand - - if we substitute those, would that make any change in your testimony?

A      Yes, Your Honor.  These job - - excuse me.  This B-20F indicates standing and walking two hours in an eight-hour day.

Q       Yeah.

A       This would reduce this individual's functional capacities to sedentary work, in my opinion.  And the jobs I offered would not accommodate that much of a limitation on the standing and walking.

Q       Yeah.  Would there be other jobs such a hypothetical individual might be able to do?

A       There are simple, routine jobs at the sedentary level also, Your Honor, which would entail basically sitting most of the day, and standing and walking for short periods up to a total of two hours a day with the sit-stand option.  Yes, there are jobs.  There are inspector, checkers at the sedentary level, 150 local, 37,000 nation.  There are waxers of glass products, 160 local, 66,000 nation.  There are sorters and graders, 100 local, 20,000 nation.  And there are sedentary assemblers, 650 local, 149,000 nation.

Q       Have you considered the Dictionary of Occupational Titles in your testimony?

A       Yes, Your Honor, I have.

Q       Is there any conflicts between your testimony and the Dictionary of Occupational Titles?

A       The only discrepancy is that the DOT does not describe or define a sit-stand option, Your Honor.  The reason I offer these jobs in response to your hypothetical is based on my experience in placing disabled individuals in jobs for the past 25 years, and I've found that these types of jobs do permit the worker to sit and stand while doing essential duties.

ALJ       Okay.  Counsel, would you have some questions you'd like to ask?

ATTY       Yes, I do.  Mr. Mahler, I'm going to lead up to a question with a little bit

of an explanation. And that is that the forms that are sent to some of the examiners are remarkable to me not only in what they ask, but in what they don't ask. Okay? So bearing that in mind, looking at the mental assessment that was presented to you in B-19F - -

ALJ         Okay, here, I'll pass it to you.

ATTY        The examiner said that this person was markedly limited in the ability to tolerate ordinary work stress, or work stress in the usual setting, I think. Okay? Now there wasn't a question on there about what impact, if any, the person's limitations would have on the ability to maintain a regular work schedule, or comply with, you know, with a normal break schedule. But when the question below said, is there any thing else or any other limitation that you feel? Okay, and what the examiner indicated there was that reliability would be impacted. And I don't' have that exhibit right in front of me, but could I take - - okay. Reliability. And what she says there, that the reason the reliability is impacted is because, under stress, the person develops symptoms which would impact reliability. So what I'm saying is what the examiner appears to be saying, is that there is a corresponding impact on reliability to that of stress, which translates into a marked limitation in reliability. If this person is markedly sensitive to stress, and is going to develop symptoms that impact reliability - - so considering that additional question on the form - -

ALJ         That you postulate - -

ATTY        That I postulate, is - -

ALJ         In what - -

ATTY        Right. Because she - - I think it's a she. She has made that relate to her limitation in stress. And the limitations in stress is the only marked limitation. So if you assume

that that is a correspondingly marked inability or marked impact on the reliability, which in turn means things like maintaining a regular work day - -

ALJ          Would you also use the same definition, limited but not precluded?  Or would you change that?

ATTY          Yes, I think I could change that, because we also know that even in extreme limitation under the definitions it's not necessarily precluded, but it's - -

ALJ          On the form - -

ATTY          Yeah.

ALJ          - - that we're talking about, okay, the definitions were - -

ATTY          Sure, right.

ALJ          Okay.  So you would probably use reliability precluded?

ATTY          No.  I say that looking - - if I might answer your question a little - - in a more detailed fashion.  Is my understanding, that even when a person meets a listing at a extreme level of functioning, that function is not totally precluded.  The Commissioner - -

ALJ          Okay.  Meeting a listing and work limitations are apples and oranges.

ATTY          No, I'm just saying that - -

ALJ          Yeah, okay.

ATTY          - - a person with a marked limitation is a severe limitation.  And yes, it's not precluded entirely.  Neither is an extreme limitation precluded entirely.  So I use the same definition that's on that form.

ALJ          Okay, Okay, so - -

ATTY          But I mean, it is a severe - -

ALJ          And as far as reliability, you mean going to work on time, and performing the - -

ATTY         Right.  I'll quantify it better.

ALJ          Yeah.

ATTY         All right.  I think generally - - and I believe the chief judge in your office defines it this way.

ALJ          Okay.

ATTY         Generally speaking, we can look at a moderate limitation as approximately 50 percent efficiency, or 50 percent of the time, or 50 percent of the workday.  In other words, it's kind of in the middle.  When you get up into the marked range, that's generally more than half the time.  You know, that's just a ballpark, but I think that's the way it's generally understood.

ALJ          So you mean like half the time he'd - -

ATTY         More than half the time.

ALJ          - - be missing work and couldn't do the - -

ATTY         More than half the time, up to approximately two-thirds of the time that this person is going to have the inability to reliably perform tasks on a regular schedule.  This person who's going to have his day interrupted, his workday interrupted, by symptoms that affect his ability to reliably perform his work tasks.

ALJ          Can you answer that, or do you need further information?

VE           No, I think I can answer it, Your Honor.  I would say that there's a rule of thumb in unskilled work.  These jobs are all routine, repetitive jobs [INAUDIBLE].  But these

assume the ability of the individual worker to work within a schedule, and function, maintain their persistence, pace, and concentration, to get enough work done that's established by the employer.

ATTY        Right.

VE        And usually a rule of thumb that's acceptable by most employers in unskilled work is you'd have to be able to function 85 to op percent of the workday. Okay, so if - - and you couldn't take extra breaks. Once or twice you could, but - - also, as far as reliability goes, for attendance you have to be on time, function within the schedule 85, 90 percent. Not leave early, not take a lot of extra breaks, and you could only miss one day a month. So if you exceeded any of those areas, you would be given warnings. And if it continued, you'd be let go.

ATTY        Okay. And that appears to be - - by that definition, that would appear to exceed those limits?

VE        Yes.

ATTY        Okay.

VE        It would.

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Alcohol abuse during some of the relevant time period (Tr. 333)

- Maintains his own hygiene (Tr. 336)

- Receives visitors at his home (Tr. 336)

54

- Fixes his own breakfast occasionally (Tr. 610)

- Cares for his dog (Tr. 610)

- Has a driver's license that is suspended due to unpaid tickets (Tr. 734-35)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that (1) the ALJ erred in finding some impairments severe in the body of his decision and not mentioning them again in his findings, (2) the ALJ failed to adequately analyze Claimant's impairments under the medical listings, (3) the ALJ erred in finding Claimant had the RFC for light work, (4) the ALJ's hypothetical question to the Vocational Expert contained limitations different from the RFC, and (5) the ALJ erred in his analysis of Claimant's mental impairments.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Commissioner argues that while the ALJ may have found some impairments severe in the body of his decision and then omitted to re-state them at the end, this represents only a clerical error. Commissioner contends the ALJ adequately analyzed Claimant's impairments under the medical listings and appropriately determined an RFC. While Commissioner concedes the ALJ's hypothetical to the Vocational Expert did not match the RFC, Commissioner contends this is not a material error. Finally, Commissioner contends the ALJ properly analyzed Claimant's mental impairments.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

       2.     Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

       3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

       4.     Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.    <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920,

and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If Claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

Whether the ALJ Erred in Omitting Impairments Found Severe in the Body of the Decision from His Ultimate Findings

Claimant first argues the ALJ erred in that some impairments mentioned in the body of the opinion as severe are not mentioned again as severe at the end of the decision in the ALJ's findings. Commissioner contends this represents simply a clerical error that does not justify reversing the ALJ's decision.

The harmless error doctrine has been recognized as applicable in Social Security cases. In Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983), the ALJ there stated the claimant "was closely approaching advanced age," when in fact the Regulations characterized him as "closely approach[ing] retirement age." The Diorio ALJ also considered work he should not have. Id. Yet because these errors did not affect the outcome of the case, the court held them harmless. Id.

Furthermore, the Court may affirm the decision of the ALJ where the ALJ makes small errors that do not affect the substance of the decision. Morgan v. Barnhart, 142 Fed. Appx. 716,

723 (4th Cir. 2005) (quoting <u>Ngarurih v. Ashcroft</u>, 371 F.3d 182, 190 n. 8 (4th Cir. 2004)).  In

<u>Morgan</u>, the Fourth Circuit stated in the Social Security context that

> While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.

<u>Morgan</u>, 142 Fed. Appx. at 723 (quoting <u>Ngarurih</u>, 371 F.3d at 190 n. 8).

The ALJ determined Claimant had both severe physical and mental impairments.  (Tr. 24-25).  In the body of his opinion, he found Claimant had severe physical impairments of degenerative arthritis, peptic ulcer disease, chronic back strain, and left hip dislocation.  (Tr. 24). Claimant had severe mental impairments of generalized anxiety disorder, undifferentiated somatoform disorder, major depressive disorder, personality disorder, not otherwise specified, and mild, borderline intellectual functioning.  (Tr. 24-25).  A more limited set of impairments was mentioned in the ALJ's "Findings" at the end of the opinion.  The ALJ there only mentioned the impairments of degenerative arthritis, peptic ulcer disease, chronic dislocation of the left hip, and status post motor vehicle accident with multiple injuries.  (Tr. 32).  Although the ALJ did not mention Claimant's status post motor vehicle accident as a severe impairment in his list of page 24, he did discuss the accident injuries immediately before reciting the list of physical impairments.  (Tr. 24).

The Court believes the instant assignment of error represents a classic case of harmless error.  Although the ALJ did not include all the impairments listed in the body of the opinion at the end, and included the additional status post motor vehicle accident impairment at the end, it is clear the ALJ contemplated all these conditions.  Any error by the ALJ was simply in poorly

drafting the opinion. Since the error clearly did not affect the substance of the opinion and was essentially clerical, as Commissioner argues, it represents harmless error. <u>Diorio</u>, 721 F.2d at 728.

The ALJ may also be affirmed in this regard under <u>Morgan</u> since any error was so small as to be irrelevant. The ALJ's error in compiling a list certainly did not affect the substance of the decision. If this Court were to reverse on this ground, the ALJ could correct the error by simply re-writing the opinion so that the same list of impairments as appears at the beginning also appears at the end. <u>Morgan</u> permits the Court to avoid an unnecessary remand in this regard. <u>Morgan</u>, 142 Fed. Appx. at 723.

## II.

### The ALJ's Analysis of the Listings

Claimant next argues the ALJ erred in his analysis of whether Claimant qualifies for disability under a medical listing. Claimant argues the ALJ's analysis of the listings under sections 1.00 and 5.00 was inadequate. Commissioner contends the ALJ's analysis was sufficient and that Claimant does not have impairments that qualify for listing level severity.

Medical listings are considered at the third step of the disability determination process. 20 C.F.R. § 416.920(a)(4)(iii). If Claimant meets a listing, he is considered disabled and entitled to benefits. <u>Id.</u> In <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit held the ALJ has a duty to identify the relevant medical listings and compare the evidence with the requirements of the listings. However, in <u>McCartney v. Apfel</u>, 28 Fed. Appx. 277, 279 (4th Cir. 2002), the court held a discussion of the evidence at step four of the disability process may substitute for a discussion at step three. The <u>McCartney</u> court was careful to point out that the

evidence in the record made clear the ALJ had considered the listing.  Id.  Since the ALJ had viewed the claimant's "conditions through the prism" of the listing, the court rejected the argument the ALJ's decision was procedurally faulty.  Id. at 280.  The District of Maryland well summarized the significance of this law for when it is alleged, as here, that the ALJ failed to consider a relevant medical listing, in Schoofield v. Barnhart, 220 F. Supp. 2d 512, 522 (D. Md. 2002).  The court stated:

> When the evidence in the administrative record clearly generates an issue as to a particular listing in the LOI [Listing of Impairments] and the ALJ fails to properly identify the LOI considered at Step Three, and to explain clearly the medical evidence of record supporting the conclusion reached at that critical stage of the analysis, a remand can be expected to result, except in those circumstances where it is clear from the record which listing or listings in the LOI were considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.

Id.

The ALJ only briefly discussed listings 1.00 and 5.00.  The ALJ stated that "The claimant's back and hip impairments are not attended by clinical findings that satisfy the requirements of . . . Section 1.00 . . . The claimant's peptic ulcer disease is not attended by clinical findings that satisfy the requirements of any of the impairments listed in Section 5.00." (Tr. 25).  The entire consideration was only two sentences.  (Id.).  The ALJ's statement regarding listings 1.00 and 5.00 at this step represents no analysis at all, but rather "a bare conclusion." Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

Therefore, under Schoofield, the court must ask a series of questions.  First, does the record generate an issue as to a listing?  Schoofield, 220 F. Supp. 2d at 522.  If not, the inquiry obviously ends there.  Cook, 783 F.2d at 1173 (providing that only relevant listings need to be

identified).  If there is an issue, does the record make clear the listing was considered?

Schoofield, 220 F. Supp. 2d at 522.  If the record does not show this, the Court must remand for

consideration.  Id.  If the listing was considered, did the ALJ discuss the evidence at another

point in his opinion to allow the Court to find substantial evidence supports the step three

analysis?  Id.

The first listing to consider is listing 1.02A.  The listing states as follows:

**1.02** *Major dysfunction of a joint(s) due to any cause*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.  Involvement of one major peripheral weight bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02A.

Listing 1.00B2b defined an inability to ambulate effectively as an extreme impairment in

a person's capacity to walk.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(1).  The person must

generally use a hand held device to aid in walking.  Id.  A person who can ambulate effectively

has the ability to walk a sufficient distance without assistance to sustain daily activities.  20

C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b(2).  Examples of a person not being able to ambulate

effectively include things like having to use two canes or crutches, needing a walker, or being

unable to walk a block at a decent pace.  Id.  The ability to walk around the home does not

represent effective ambulation.  Id.

The Court believes the record does not present an issue regarding Claimant's ability to

ambulate effectively and so the ALJ did not err in failing to give a detailed evaluation.  Claimant

fractured his femur and had surgery to repair that fracture in 1990. (Tr. 169). By April 1991, it was noted Claimant had no functional deformity. (Tr. 168). In February 1999, Dr. Sabio noted Claimant walked with normal gait and with no aids. (Tr. 239). This notation is especially important since Claimant must show disability by the end of 1998. (Tr. 23). Later, in 2003, Dr. Gobunsuy stated Claimant ambulated without aids and with normal gait. (Tr. 239). Furthermore, Claimant stated at the administrative hearing he could walk one hundred to two hundred yards. (Tr. 756). Since Claimant cannot meet the requirement of inability to ambulate effectively, he cannot qualify for benefits under this section.

The next listing to consider is listing 1.03. The listing states a person qualifies for disability when he has "**Reconstructive surgery or surgical arthrodesis of a major weight-bearing _joint_**, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onsent." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03. As noted above, Claimant cannot meet the requirements for an inability to ambulate effectively. He therefore cannot qualify for disability under this section.

Claimant also alleges disability under listing 1.04. This listing states:

**1.04 _Disorders of the spine_** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.

The Court concludes there is also no issue of disability under this listing.  Claimant does not have an impairment satisfying the first paragraph of the listing.  Claimant has been diagnosed with chronic back strain.  (Tr. 242).  However, Dr. Sabio found in February 1999 that Claimant had normal spine curvature.  (Tr. 240).  There was "no tenderness over the spinous processes." (Id.).  There was also "no paravertebral muscle spasm or rigidity."  (Id.).  Dr. Pascasio also found in 1997 regarding Claimant's back that he had "No costovertebral angle tenderness; normal spine curvature."  (Tr. 174).  This was again noted by Dr. Pascasio in 1999 and 2000. (Tr. 261, 483).  Dr. Sabbagh found a lack of costovertebral angle tenderness in 1999 as well. (Tr. 407).  In 2003, Dr. Gobunsuy noted a normal spine curvature with some tenderness.  (Tr. 616).  There was no atrophy of the gluteus muscle.  (Id.).  It was also found in 2003 that Claimant had "no evidence of fracture or dislocation of the vertebrae.  The disc spaces are normal and the height of the vertebral bodies is maintained.  The surrounding soft tissues appear normal."  (Tr. 641).  In sum, Claimant's impairments regarding his spine do not qualify for listing level severity.

Claimant next alleges disability under listing 1.06. This listing requires a lack of ability "to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.06. The Court has already found Claimant cannot demonstrate this. Therefore, Claimant cannot qualify for disability under this listing.

Claimant also contends the ALJ should have more thoroughly considered some listings regarding digestive impairments. He first alleges disability under listing 5.02. This provides for disability where a person shows "***Recurrent upper gastrointestinal hemorrhage from undetermined cause*** with anemia manifested by hematocrit of 30 percent or less on repeated examinations." 20 C.F.R. pt. 404, subpt. P, app. 1, § 5.02.

The Court believes the record again fails to disclose an issue regarding this listing. Claimant was hospitalized in 1997 and diagnosed with acute gastritis with bleeding. (Tr. 170). Claimant was admitted in 1998 for abdominal pain, nausea, and vomiting. (Tr. 191). Claimant was noted to have a history of untreated ulcer disease. (Tr. 193). Claimant was again admitted in July 1998 and August 1999 with complaints of abdominal pain and vomiting. (Tr. 213. 260). He went into the hospital for abdominal pain and nausea in December 1999 as well. (Tr. 406). Claimant was in the hospital for acute gastritis with bleeding in November 2000. (Tr. 664). Claimant was then admitted for erosive duodenitis and anemia secondary to blood loss in April 2002. (Tr. 685). Yet in none of these cases can Claimant demonstrate a hematocrit level of thirty percent or less. Rather, the record demonstrates a hematocrit level consistently above listing level severity. In August 1997, Claimant's hematocrit level was tested at 51.6 percent, 45.1 percent, 44.5 percent, 44.8 percent, and 46.3 percent. (Tr. 176-79, 183). Claimant's hematocrit level was 49.5 percent in October 1998 and 45.6 percent in August 1999. (Tr. 210,

263).  His hematocrit level dipped to 38.7 percent in August 1999, but this remains well above

listing level severity.  (Tr. 265).  By December 1999, the hematocrit level had gone up to 49.8

percent and in April 2000 it tested at 46.5 percent.  (Tr. 368, 488).  Even when Claimant was

diagnosed with anemia in April 2002, his hematocrit level was 38.4 percent.  (Tr. 685).

Claimant clearly cannot meet the required hematocrit level under this listing and so cannot

qualify for benefits under it.

Claimant also alleges disability under listing 5.03.  This listing requires "***Stricture,

stenosis, or obstruction of the esophagus (demonstrated by endoscopy or other appropriate

medically acceptable imaging)*** with weight loss as described under listing 5.08."  20 C.F.R. pt.

404, subpt. P, app. 1, § 5.03.  The amount a person can weigh while qualifying for disability

under listing 5.08 depends on the person's height.  20 C.F.R. pt. 404, subpt. P, app. 1, § 5.08.

Claimant has been measured at sixty four inches tall.  (Tr. 239).  The most a person of that height

can weigh to qualify for disability under listing 5.08 is 103 pounds.  20 C.F.R. pt. 404, subpt. P,

app. 1, § 5.08.  Claimant has tested well above this level.  (Tr. 239, 277, 331, 615).  Since

Claimant cannot meet the weight requirements of the listing, he cannot qualify for benefits under

it.  There is no issue of this listing from the record.

The final listing Claimant alleges disability under is listing 5.04.  This listing requires as

follows: "***Peptic ulcer disease (demonstrated by endoscopy or other appropriate medially

acceptable imaging)***. With: A. Recurrent ulceration after definitive surgery persistent despite

therapy; or B. Inoperable fistula formation; or C. Recurrent obstruction demonstrated by

endoscopy or other appropriate medically acceptable imaging; or, D. Weight loss as described

under 5.08."  20 C.F.R. pt. 404, subpt. P, app. 1, § 5.04.  The Court has already found Claimant

cannot meet the weight requirements of listing 5.08.  Therefore, he must qualify with one fo the first three criteria.

The record indicates Claimant cannot claim disability under this listing.  Claimant has peptic ulcer disease.  (Tr. 195).  Yet there is no evidence Claimant has had surgery to correct this problem and that the disease has lasted in spite of surgery.  In fact, Dr. Villarreal noted Claimant's ulcers were untreated.  (Tr. 193).  There is no evidence in the record Claimant has suffered from an inoperable fistula formation.  Finally, there is no evidence Claimant's peptic ulcer disease caused an obstruction.  In December 1999, Dr. Pascasio found no evidence of any "definite bowel obstruction or ileus."  (Tr. 369).  Dr. Pascasio again noted a lack of obstruction that same month.  (Tr. 378).  Dr. Sabbagh also found no evidence of obstruction in December 1999, stating "I found no evidence of obstruction, hernia, reflux or esophagitis."  (Tr. 418).  Thus, the record does not create an issue regarding this listing.

## III.

### The ALJ's RFC Assessment

Claimant next contends the record lacks substantial evidence to support the ALJ's RFC assessment of light work.  He argues the ALJ ignored a significant amount of evidence showing Claimant only capable of sedentary work.  Claimant bases his argument around his limitations regarding walking and standing.  Commissioner contends substantial evidence supports the finding of light work.  Commissioner further argues that even if Claimant can only perform sedentary work, the ALJ should be affirmed since a large number of sedentary jobs exist that he can perform.

The RFC is what Claimant can still do despite his limitations.  20 C.F.R. § 404.1545.  It

is an assessment based upon all of the relevant evidence.  Id.  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  Id.  Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments.  Id.

The Regulations define light work as the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b). The Regulations further provide that "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  A person must "have the ability to do substantially all of these activities" for an ALJ to find him capable of a significant amount of light work.  Id.

The Regulations define sedentary work as the ability to lift "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a).  A sedentary position may involve occasional walking and standing.  Id.

The ALJ determined Claimant could perform some light work.  (Tr. 30).  Claimant was limited to low stress work involving simple tasks.  (Id.).  He was to avoid hazards and only have minimal contact with the public.  (Id.).  The ALJ's finding will be upheld as long as it is

supported by substantial evidence.  <u>Hays</u>, 907 F.2d at 1456.

The Court believes the record details limitations in walking significant enough to make the ALJ's RFC unsupported by substantial evidence.  Claimant suffered a femur fracture in 1990.  (Tr. 151).  In April 1991, Dr. Snead stated that the fracture was "completely healed up." (Tr. 168).  The ALJ correctly noted Dr. Snead found Claimant exhibited "no functional disability."  (Tr. 28, 168).  In February 1991, Dr. Snead had noted Claimant was making good progress and could perform light work, but could not perform any climbing.  (Tr. 168).  In February 1999, Dr. Sabio stated Claimant had muscle atrophy in the left leg.  (Tr. 242).  Dr. Hubbard diagnosed problems in the healing of his femur in 2000.  (Tr. 630).  Dr. Hubbard related Claimant experienced functional problems with his walking due to this problem.  (<u>Id.</u>). Dr. Gobunsuy completed an evaluation in September 2003.  (Tr. 614).  Although Dr. Gobunsuy found no atrophy, he did find limitations in walking.  (Tr. 617, 621).  Claimant was limited to never climbing and only occasionally balancing, kneeling, crouching, crawling, and stooping. (Tr. 621).  Based on this evidence, the Court concludes the ALJ should have included limitations in walking in his RFC of Claimant.  The ALJ's failure to do so is not supported by substantial evidence.

Nevertheless, the Court believes this error did not affect the substance of the ALJ's decision and so the ALJ should be affirmed in this regard.  The Court may affirm the decision of the ALJ where the ALJ makes small errors that do not affect the substance of the decision. <u>Morgan</u>, 142 Fed. Appx. at 723.

At the administrative hearing, the Vocational Expert was shown the functional limitations assessed by Dr. Gobunsuy.  (Tr. 775).  The Vocational Expert opined those limitations would

reduce a person's functional capacity to sedentary work.  (Id.).  There were still jobs available with these limitations.  These positions included inspectors (150 local, 37,000 national), waxers of glass products (160 local, 66,000 national), sorters and graders (100 local, 20,000 national), and assemblers (650 local, 149,000 national).  (Tr. 776).

The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  In Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit stated (albeit in a footnote) that 110 regional jobs represents a significant number of jobs under the statute.

In this case, the Vocational Expert identified 1,060 local jobs Claimant could perform at a sedentary level.  This clearly represents a significant number under Hicks.

IV.

Differences Between the ALJ's RFC and His Hypothetical to the Vocational Expert

Claimant next assigns error to the ALJ's decision on the ground that the RFC the ALJ assigned to Claimant is different from the hypothetical question asked to the Vocational Expert. Claimant argues that since the Vocational Expert listed jobs based upon a hypothetical not ultimately adopted, the ALJ's decision lacks substantial evidence to support it.  Commissioner admits such a discrepancy exists as to Claimant's limitations regarding contact with the public, but contends the difference is not significant enough to warrant reversal.

The Fourth Circuit has held an ALJ's hypothetical questions must "fairly set out all of claimant's impairments."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  Where a hypothetical does not accomplish this, the case will be remanded for further consideration.  Id. at

51.

The ALJ's residual functional capacity determined Claimant could perform light work with qualifications.  (Tr. 30).  The ALJ limited Claimant "to low stress work consisting of simple and routine tasks; the claimant should avoid exposure to dangerous moving machinery, unprotected heights and other workplace hazards; the claimant should have minimal contact with the general public."  (Id.).

In asking the Vocational Expert a hypothetical question, the ALJ asked that he look at exhibit B-19.  (Tr. 774).  The ALJ noted the first page had a definition of terms and the Vocational Expert responded the document was a "mental or residual capacity form."  (Id.).  This clearly identified the document at issue as the assessment by Lois Holloway, M.S., on pages 612-13.  The ALJ asked the Vocational Expert whether a hypothetical person could perform any work if he had the limitations described in the Holloway assessment, and additionally had a vocational background like Claimant, could perform light or sedentary exertion work, required a sit-stand option, needed to avoid uneven ground, moving machinery, and the sunlight.  (Tr. 774-75).  The Holloway assessment provided Claimant could understand, remember, and carry out short, simple instructions.  (Tr. 612).  He had moderate limitations in his ability to understand, remember, and carry out detailed instructions.  (Id.).  Claimant had slight limitations in his ability to make judgments on simple work related decisions.  (Id.).  Claimant also had impairments regarding his ability to respond to others in a work setting.  (Tr. 613).  He had a slight impairment in his ability to interact with the public.  (Id.).  He had a moderate impairment regarding the ability to interact with supervisors and co-workers and to respond to work setting changes.  (Id.).  Claimant had a marked impairment in his ability to respond to work pressures in

a normal work setting.  (Id.).  Finally, Claimant has limitations regarding reliability.  (Id.).  He has a tendency to develop somatic symptoms under stress.  (Id.).

Based on the Vocational Expert's answer to his question, the ALJ determined jobs existed Claimant could perform.  (Tr. 31).  The ALJ specifically found the Vocational Expert had testified when considering Claimant's "residual functional capacity as determined."  (Id.).

The ALJ's hypothetical question and the RFC he assigned to Claimant can each be broken down into various elements.  The RFC involved four elements: (1) light work, (2) low stress work involving simple, routine tasks, (3) no exposure to dangerous moving machinery, unprotected heights, or other hazards, and (4) only minimal contact with the public.  The hypothetical question to the Vocational Expert may be similarly broken down as involving the following: (1) light or sedentary work, (2) sit-stand option, (3) no hazards such as uneven ground or moving machinery, (4) no sunlight, and (5) the limitations of the Holloway assessment.

The limitations of the hypothetical largely align with the RFC.  The light work element matches between the hypothetical and the RFC.  The RFC element of low stress work involving simple, routine tasks is covered by the ALJ's inclusion of the Holloway assessment in the hypothetical since Holloway found Claimant had no limitations carrying out simple duties, yet had moderate limitations regarding detailed duties.  (Tr. 612).  The RFC element of no exposure to dangerous moving machinery or unprotected heights receives inclusion in the hypothetical's requirement of no hazards like uneven ground or moving machinery.  Although uneven ground is not precisely the same as unprotected heights, the Court believes any difference to be immaterial. Morgan, 142 Fed. Appx. at 723.

Yet as Commissioner admits, the RFC requirement of minimal contact with the public

was not included in the hypothetical.  The ALJ did not include this limitation by expressly

stating it.  (Tr. 774-75).  The Holloway assessment also did not include this limitation.  In fact, it

found Claimant had only slight impairments in interacting with the public.  (Tr. 613).  "Slight"

was defined as having "some mild limitations in this area, but the individual can generally

function well."  (Tr. 612).

Since the ALJ's hypothetical did not accurately reflect the limitations found in the RFC,

the case must be remanded to Commissioner for further consideration.  Walker, 889 F.2d at 50-

51.  Although Commissioner contends this omission is not significant, the Court must have

overwhelming confidence an error did not affect the decision of the case to uphold the ALJ in

spite of a legal error.  Morris v. Barnhart, 326 F. Supp. 2d 1203, 1209 (D. Kan. 2004).  The

Court cannot say that here.

V.

The ALJ's Mental Findings

Finally, Claimant asserts the ALJ erred in his assessment of Claimant's mental

impairments.  Claimant contends the ALJ ignored his limitations in reliability.  He states the

Vocational Expert ruled out all jobs when a limitation on reliability was included.

Commissioner contends substantial evidence supports the ALJ's mental findings.  He states the

ALJ provided for Claimant's limitations in reliability by limiting him to low stress work.  The

ALJ's findings will be upheld as long as they are supported by substantial evidence.  Hays, 907

F.2d at 1456.

The Court believes substantial evidence supports the ALJ's findings and he should

therefore be affirmed in this regard.  Claimant is correct that he was several times noted to have

poor reliability. (Tr. 339, 471, 613). Claimant's problems in reliability were described as a tendency "to develop somatic symptoms when under stress." (Tr. 613). The ALJ accounted for this by limiting Claimant to "low stress work consisting of simple and routine tasks." (Tr. 30). This is a reasonable way to account for this limitation.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ's hypothetical question to the Vocational Expert did not incorporate all of Claimant's limitations.

2. Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: July 31, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE